## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re: | Case No. 16-44815 |
| TOTAL HOCKEY, INC., *et al.*, | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (C) SCHEDULING AN AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (E) GRANTING RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN THE DEBTORS AND THE PURCHASER, (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (D) GRANTING RELATED RELIEF

Total Hockey, Inc. ("**THI**"), and its affiliated debtors and debtors in possession (the "**Debtors**"), by and through their undersigned counsel, respectfully move this Court, pursuant to sections 105(a), 363, 364, 365, and 503 title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and 9013-1 and 9013-3 of the Local Rules of the Eastern District of Missouri Bankruptcy Court (the "**Local Rules**"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Bid Procedures Order**"),[2] (i)(a) approving the

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, are: Total Hockey, Inc. (4010); Player's Bench Corporation (8085); and Hipcheck, L.L.C. (4406). The Debtors' mailing address is 3120 Riverport Tech Center Dr., Maryland Heights, MO 63043.

[2] A copy of the proposed Bid Procedures Order will be made available on the case website at www.omnimgt.com/totalhockey (the "**Case Website**").

proposed auction and bid procedures attached as **Exhibit 1** to the Bid Procedures Order (the "**Bid Procedures**") to be employed in connection with the proposed sale (the "**Sale**") of substantially all the Debtors' assets,[3] (i)(b) scheduling an auction (the "**Auction**") if the Debtors receive two or more timely and acceptable Qualified Bids (as defined below), (i)(c) scheduling a hearing to consider approval of the Sale (the "**Sale Hearing**"), (i)(d) approving the form and manner of notice thereof, and (i)(e) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts; and, pursuant to Bankruptcy Code sections 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006, for entry of an order (ii)(a) approving the Stalking Horse Purchase Agreement (as defined below) between the Debtors and the Stalking Horse Bidder (as defined below) including the Bid Protections (defined below), (ii)(b) authorizing the Sale of substantially all of the Debtors' assets to the Stalking Horse Bidder or the Successful Bidder (as defined below), at the Auction, free and clear of liens, claims, interests and encumbrances, (ii)(c) authorizing the assumption and assignment of certain executory contracts and unexpired leases to either the Stalking Horse Bidder or the Successful Bidder, and (ii)(d) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction and Venue

1.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] The only assets of Hipcheck, L.L.C. are its equity interests in and to THI. Therefore, only THI and Player's Bench Corporation ("**Player's Bench**") are parties to the Stalking Horse APA.

## Background

2.      On the date hereof (the "**Petition Date**"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors are a national retailer of hockey and lacrosse equipment, apparel, and accessories. Additional details regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of these cases are set forth in the *Declaration of Lee Diercks* [Docket No. 4] (the "**First Day Declaration**").[4]

4.      The Debtors and Citizens Business Capital, a Division of Citizens Asset Finance, Inc. (a Subsidiary of Citizens Bank, N.A.), as administrative agent and collateral agent (the "**Revolving Credit Agent**") for certain lenders (collectively, the "**Revolving Lenders**") are parties to that certain Credit Agreement dated as of June 17, 2015 (as amended, supplemented or otherwise modified from time to time prior to the date hereof, the "**Revolving Credit Agreement**").

5.      The Revolving Credit Agreement provides for a total aggregate commitment of up to $30,000,000 and matures on October 31, 2016. The obligations under the Revolving Credit Agreement are secured by substantially all property and assets of the Debtors, subject to the terms of the Intercreditor Agreement (as defined herein).  The Revolving Credit Agreement was amended by that certain Forbearance Agreement and First Amendment to Credit Agreement dated as of June 3, 2016 and the amendment thereto dated as of June 30, 2016 , by and between

---

[4] All capitalized terms not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

the Debtors and the Revolving Credit Agent, on behalf of the Revolving Lenders (as thereafter amended, the "**Revolving Credit Forbearance Agreement**").

6.      Additionally, the Debtors and Gordon Brothers Finance Company, LLC, as administrative agent and collateral agent (the "**Term Loan Agent**" and, together with the Revolving Credit Agent, the "**Agents**") for certain lenders (collectively, the "**Term Lenders**" and, together with the Revolving Lenders, the "**Lenders**"), are parties to that certain Term Loan Agreement dated as of June 17, 2015 (as amended, supplemented or otherwise modified from time to time prior to the date hereof, the "**Term Loan Agreement**").

7.      The Term Loan Agreement provided for a fully-funded $5 million term loan to the Debtors upon the closing of the Term Loan Agreement.  The obligations under the Term Loan Agreement are secured by substantially all property and assets of the Debtors, subject to the terms of the Intercreditor Agreement.  The Term Loan Agreement was amended by that certain Forbearance Agreement and First Amendment to Term Loan Agreement dated as of June 3, 2016 and the amendment thereto dated as of June 30, 2016 , by and between the Loan Parties and the Term Loan Agent, on behalf of the Prepetition Term Lenders (as thereafter amended, the "**Term Forbearance Agreement**" and, together with the Revolving Credit Forbearance Agreement, the "**Forbearance Agreements**").

8.      The Agents entered into that certain Intercreditor Agreement dated as of June 17, 2015 (the "**Intercreditor Agreement**"), pursuant to which the Agents agreed, inter alia, that:  (a) the Revolving Credit Agent shall have the senior priority security interest in and lien against the Revolver Priority Collateral (as defined therein), consisting of all assets and property of the Loan Parties other than the Term Loan Priority Collateral (as defined therein); and the Term Loan Agent shall have the senior priority security interest in and lien against the Term Loan Priority

4

Collateral, consisting of all of the Loan Parties' (i) Intellectual Property (as defined therein); (ii) equipment, including, without limitation, store fixtures; (iii) "key man" or "key person" life insurance policies; and (iv) all proceeds or products of the foregoing; and (b) the Revolving Credit Agent shall have a junior security interest in and lien against the Term Loan Priority Collateral; and the Term Loan Agent shall have a junior security interest in and lien against the Revolving Priority Collateral

9.      Pursuant to the Forbearance Agreements, the Debtors were obligated, inter alia, (a) by June 3, 2016, to deliver to the Agents a list of liquidation firms to act as bidders for a proposed liquidation of the Debtors' entire chain of store locations (such sale, a "**Full Chain Liquidation**"); (b) by June 10, 2016, deliver to the proposed bidders certain information packages and requests for proposals to conduct the Full Chain Liquidation, which proposals were due to be received by the Debtors by June 17, 2016; and (c) by June 23, 2016, to identify the successful bidder to conduct the Full Chain Liquidation and enter into a binding agreement to govern the Full Chain Liquidation.

10.      The Forbearance Agreements also provided that the Debtors were to continue their ongoing efforts to pursue sources of a refinancing of the obligations owed to the Lenders as well as evaluate potential sales of the assets of, and/or equity interests in, the Debtors.  In that regard, the Debtors, in early April 2016, started to contact alternative lenders and banks to determine if other sources of capital could be obtained. The Debtors and/or its advisors reached out to approximately fifteen (15) various alternative lenders and three (3) banks to determine if they might provide financing to replace and payoff the outstanding obligations owed to the Lenders.  A number of the alternative lenders signed non-disclosure agreements, accessed data rooms, and had meetings or calls with management as part of their due diligence.  In mid-June,

the Debtors received general proposals or term sheets from (a) two (2) alternative lenders, offering to provide senior secured financing; (b) one (1) lender, offering to provide junior lien financing; and (c) one (1) alternative lender, offering to provide both senior and junior lien financing as part of a refinancing effort. Ultimately, however, the Debtors were unable to identify a potential refinancing lender or investor that would refinance the obligations to the Lenders and provide any significant additional liquidity for the Debtors to operate their business and address their substantial outstanding obligations to unsecured creditors.

11.     The Debtors complied with the first two milestones in the Forbearance Agreements by timely providing the Agents a list of liquidation firms to act as bidders for the Full Chain Liquidation and delivering to the proposed bidders information packages and requests for proposals to conduct the Full Chain Liquidation, including a proposed form of Agency Agreement to govern the Full Chain Liquidation (the "**Agency Agreement**"). In response, the Debtors received four (4) written proposals to conduct the Full Chain Liquidation (collectively, the "**Liquidation Proposals**").

12.     At the time the Debtors were entering into the Forbearance Agreements and complying with the above milestones relating to a Full Chain Liquidation, the Debtors received interest and an eventual letter of intent from a strategic party interested in a going concern purchase of substantially all of the Debtors' assets which would provide substantially more value to the Debtors and their creditors than the best of the Liquidation Proposals. In consultation with the Agents, the Debtors have selected the strategic buyer to serve as their stalking horse bidder.

13.     Specifically, the Debtors (i.e., THI and Player's Bench) and TSG Enterprises, LLC and its nominee TSG-TH Acquisition Co., LLC (collectively, the "**Stalking Horse**

53433059.9

**Bidder**") have entered into an Asset Purchase Agreement, dated as of July 6, 2016 (the "**Stalking Horse APA**"). In the Stalking Horse APA, the Stalking Horse Bidder proposes to purchase substantially all of the Debtors' assets (the "**Assets**") for approximately $22,500,000.00, subject to proration and post-closing adjustments pursuant to the terms and procedures relating to the Adjustment Fund (the "**Purchase Price**"), which will serve as a competitive baseline of recovery for the Debtors' stakeholders. The proposed transaction, if approved, will generate significant value for the Debtors' estates, and among other things, satisfy a significant portion of the prepetition claims against the Debtors and pave the way for the best outcome to these cases.

14.     The Debtors now seek authority to market test the transactions contemplated by the Stalking Horse APA (collectively, the "**Stalking Horse Bid**") to ensure that the Debtors obtain the highest or otherwise best offer or combination of offers for the Debtors' assets. If approved, the proposed bid procedures (the "**Bid Procedures**") will enable the Debtors to move expeditiously towards the best resolution of these cases. As set forth in further detail below, the Sale, the Stalking Horse APA, the Bid Procedures, and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders. Accordingly, the Debtors respectfully request that the Court grant this Motion.

15.     Due to the late emergence of the Stalking Horse Bidder in the Debtors' sale and refinancing process, however, the Debtors have taken additional steps to ensure a robust sale process. First, the Stalking Horse Bid contains certain contingencies that are within the control of the Stalking Horse Bidder related to financing and due diligence as set forth in Section 8.12 and 8.13 of the Stalking Horse APA, respectively (collectively, the "**Stalking Horse Contingencies**"). The Stalking Horse Bidder shall have until **12:00 p.m. (CT) on July 22, 2016**

(the "**Stalking Horse Contingencies Deadline**") to deliver to the Debtors a written notice waiving or deeming satisfied all of the Stalking Horse Contingencies. If the Stalking Horse Bidder fails to deliver such written notice to the Debtors by the Stalking Horse Contingencies Deadline, then the Stalking Horse Bid shall automatically and immediately be deemed withdrawn, the Stalking Horse APA shall automatically and immediately be deemed terminated, and the Stalking Horse Bidder shall no longer serve in such capacity or be entitled to any of the Bid Protections (defined below).

16.     Second, no later than July 25, 2016, the Debtors shall deliver to the Agents an agency agreement for a Full Chain Liquidation (the "**Back-Up Liquidation Bid**") acceptable to the Agents, and file the Back-Up Liquidation Bid with the Court and provide notice to creditors and other parties in interest. The Debtors shall seek approval of the Back-Up Liquidation Bid at a status hearing to be set on or about July 26, 2016, which the Debtors anticipate will coincide with the final hearing on certain first day motions filed by the Debtors. The Debtors shall seek approval of the Back-Up Liquidation Bid regardless of whether the Stalking Horse Bidder waives or deems satisfied the Stalking Horse Contingencies as set forth above to avoid as situation where no other bidders appear at the Auction and the Stalking Horse Bidder fails to close the Stalking Horse APA.

17.     Third, starting June 23, 2016, the Debtors commenced a supplemental marketing effort to generate potential bidders at the Auction to purchase the Assets on a going concern basis. In particular, the Debtors identified approximately 53 private equity firms and 11 strategic competitors that might be interested in purchasing the Assets as a going concern and commenced communications with such parties regarding the opportunity. The Debtors will continue these efforts after the bankruptcy filing.

8

18.     Finally, the Debtors negotiated an agreement with the Lenders to permit them to use cash collateral during the course of these cases which should provide them with sufficient runway to execute on a value-maximizing sale process. Pursuant to the proposed order approving the cash collateral agreement (the "**Cash Collateral Order**"), the Debtors are required to move expeditiously toward the sale milestones set forth below and in the Bid Procedures. The sale milestones are structured to allow for the Debtors' sale of substantially all of their assets to be closed within approximately five weeks after the start of these cases.

## Relief Requested

19.     By this Motion, the Debtors respectfully request, pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503 and Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014, the entry of (A) an order (i) establishing bid procedures for the Sale of the Assets; (ii) establishing procedures relating to the assumption and assignment of executory contracts and unexpired leases, (iii) approving the Bid Protections pursuant to the Stalking Horse Agreement and Sale to the Stalking Horse Bidder, subject to (1) the Stalking Horse Bidder's delivery to the Debtors of a written notice waiving or deeming satisfied all of the Stalking Horse Contingencies by the Stalking Horse Contingencies Deadline; and (2) the results of the Auction; (iv) approving the form and manner of sale, cure and other related notices, and (v) scheduling the Auction (if necessary) and Sale Hearing; and (B) an order (i) approving the Sale of the Assets free and clear of all liens, claims, encumbrances and interests; (ii) approving the assumption and assignment of the relevant executory contracts and unexpired leases to the Successful Bidder; and (iii) granting related relief.

## Argument

20.     The Debtors seek entry the Bid Procedures Order:

(a)    authorizing and approving the Bid Procedures attached to the Bid Procedures Order as **Exhibit 1** and approving the Bid Protections (as defined below) in connection with the sale of substantially all of the Debtors' Assets;

(b)    approving the form and manner of notice of an Auction and Sale Hearing with respect to the Sale, attached as **Exhibit 2** to the Bid Procedures Order (the "**Sale Notice**");

(c)    scheduling the Auction and Sale Hearing;

(d)    approving the Bid Protections;

(e)    approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "**Contracts**"); and

(f)    granting related relief.

21.    In addition, the Debtors will seek entry of the Sale Order at the conclusion of the Sale Hearing:

(a)    authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bid Procedures) on the terms substantially set forth in the Successful Bid;

(b)    authorizing and approving the Sale of all or substantially all of the Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Successful Bid;

(c)    authorizing the assumption and assignment of the Contracts; and

(d)    granting any related relief.

22.    The Debtors reserve the right to file and serve any supplemental pleading or declaration that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order before the Sale Hearing.

### The Proposed Sale

**I.    The Proposed Stalking Horse APA and Contemplated Section 363 Sale.**

23.    The Debtors entered into arm's-length negotiations with the Stalking Horse Bidder to finalize mutual and agreeable terms of the Stalking Horse Bid for the sale of the

53433059.9

Assets. The Debtors believe a prompt Sale of the Assets represents the best alternative available for all stakeholders in these cases. Moreover, it is critical for the Debtors to execute on their proposed Sale within the timeframe contemplated by the Stalking Horse APA and Cash Collateral Order. Under the Cash Collateral Order, the Debtors are required to hold a sale hearing by **August 3, 2016**, and a sale is to be consummated by **August 5, 2016**.

24.    The Debtors respectfully request that the Court approve the following general timeline:

(a) ***Stalking Horse Contingencies Deadline:***  The Stalking Horse Bidder shall have until the Stalking Horse Contingencies Deadline of **12:00 p.m. (CT) on July 22, 2016** to deliver to the Debtors a written notice waiving or deeming satisfied all of the Stalking Horse Contingencies. If the Stalking Horse Bidder fails to deliver such written notice to the Debtors by the Stalking Horse Contingencies Deadline, then the Stalking Horse Bid shall automatically and immediately be deemed withdrawn, the Stalking Horse APA shall automatically and immediately be deemed terminated, and the Stalking Horse Bidder shall no longer serve in such capacity or be entitled to any of the Bid Protections.  If the Stalking Horse Bidder delivers the required notice by the Stalking Horse Contingencies Deadline, then the Stalking Horse Bidder's rights in and to the Bid Protections shall fully vest and be enforceable against the Debtors and their estates and the parties shall proceed to the Auction as otherwise set forth in the Bid Procedures.

(b) ***Notice of Status of Stalking Horse Contingencies:***  On or before **4:00 p.m. (CT) on July 22, 2016**, the Debtors shall file a notice on the Court's Docket and post a notice on the Case Website regarding whether the Stalking Horse Contingencies have been waived or deemed satisfied by the Stalking Horse Contingencies Deadline as set forth above.

(c) ***Back-Up Liquidation Bid:***  No later than **July 25, 2016**, the Debtors shall deliver to the Agents the Back-Up Liquidation Bid, and file the Back-Up Liquidation Bid with the Court and provide notice to creditors and other parties in interest.

(d) ***Status Hearing Relating to Stalking Horse Contingencies and Approval of Back-Up Liquidation Bid:*** on or about **July 26, 2016, at [___:___] [__].m. (CT)**, as the date and time for a status hearing regarding (i) the status of the Stalking Horse Bid following expiration of the Stalking Horse Contingencies Deadline and (ii) the Debtors' request for approval of the Back-Up Liquidation Bid.

(e) ***Contract Cure Objection Deadline***: 4:00 p.m. (CT) seven (7) calendar days from service of the Contract Notice (as defined below), as the deadline to object to the cure amounts listed in the Contract Notice;

(f) *Bid Deadline*: **12:00 p.m. (CT), on or before July 27, 2016**, as the deadline by which bids for the Assets (as well as the deposit and all other documentation required under the Bid Procedures for Qualified Bidders (as defined in the Bid Procedures)) must be actually received (the "**Bid Deadline**");

(g) *Auction*: **July 29, 2016, at 10:00 a.m. (CT)**, as the date and time the Auction, if needed, will be held at the offices of Polsinelli PC, 100 S. Fourth St., Ste. 1000, St. Louis, MO 63102;

(h) *Sale Objection Deadline*: **4:00 p.m. (CT), on August 1, 2016**, which is seven (7) calendar days after the Bid Deadline, as the deadline to object to the Sale;

(i) *Sale Hearing*: on or before **August 3, 2016, at [____:____] [__].m. (CT)**, as the date and time for the Sale Hearing.

25.      The Debtors believe that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing these estates.  Further, the start to the hockey and lacrosse selling season is late August/early September, to coincide with the start of the school year, thus it is critical to the Stalking Horse Bidder and the Debtors' going concern value that the Sale and Auction occur quickly. To further ensure that the Debtors' proposed Auction and Sale process maximizes value to the benefit of the Debtors' estates, the Debtors will use the time following entry of the Bid Procedures Order to actively market the Assets in an attempt to solicit higher or otherwise better bids. The Debtors believe the relief requested by this Motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

**II.    Material Terms of the Stalking Horse APA.**

26.      The following chart summarizes the terms and conditions of the Stalking Horse APA (attached hereto as **Exhibit B**) and discloses certain information:[5]

---

[5] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse APA, the Stalking Horse APA shall govern in all respects. Capitalized terms used in the following summary shall have the meanings ascribed to them in the Stalking Horse APA. All references to schedules or sections in the following summary shall refer to schedules or sections of the Stalking Horse APA.

| Stalking Horse APA Provision | Summary Description |
|---|---|
| Parties | **Sellers:** Total Hockey, Inc., a Missouri corporation, Hipcheck, L.L.C., a Missouri limited liability company and Player's Bench Corporation, a Colorado corporation<br><br>**Buyer(s):** TSG Enterprises, LLC or its nominee |
| Purchase Price | **Purchase Price:** $22.5 Million subject to proration and post-closing adjustments pursuant to the terms and procedures relating to the Adjustment Fund<br><br>**Deposit:** $250,000.00 |
| Stalking Horse Protections | **Breakup Fee:** A breakup fee of $250,000.00 (the "**Breakup Fee**") (roughly 1.11% percent of the proposed purchase price).<br><br>**Minimum Bid:** The aggregate consideration proposed by each Bid, other than the Back-Up Liquidation Bid, must equal or exceed the sum of (i) the Bid Value set forth in the Stalking Horse Bid, and (ii) $400,000.00 (the "**Minimum Overbid**," and collectively with the Breakup Fee, the "**Bid Protections**"). |
| Acquired Assets | All or substantially all Assets of the Sellers. |
| Assumed Obligations | The Assumed Obligations listed in Section 2.4 of the Stalking Horse APA. |
| Assumed Contracts and Leases | The Assumed Contracts and Assumed Leases set forth in Section 2.2 of the Stalking Horse APA. |
| Excluded Assets | The Excluded Assets set forth in Section 2.3 to the Stalking Horse APA. |
| Representations and Warranties | Customary representations and warranties by a Purchaser and Seller. |
| Agreements with Management | Michael Benoit, and such other principals and officers as the Stalking Horse Bidder and the applicable persons as may be agreed upon, entering into an employment or consulting contracts, including a noncompetition covenant. |
| Releases | None. |
| Private Sale/No Competitive Bidding | Not applicable. The Debtors have proposed an open Auction and Sale process. |

13

| | |
|---|---|
| **Closing and Other Deadlines** | • Entry of the Bid Procedures Order: **July 8, 2016**<br>• Stalking Horse Contingencies Deadline: **July 22, 2016 at 12:00 p.m. (CT)**<br>• Status hearing regarding status of Stalking Horse Contingencies and approval of Back-Up Liquidation Bid: **July 26 at __:__ a.m. (CT)**<br>• Bid Deadline: on or before **July 27, 2016 at 12:00 p.m. (CT)**<br>• Auction: **July 29, 2016 at 10:00 a.m. (CT)**<br>• Sale Hearing: **August 3, 2016 at [     :     ] [   ].m. (CT)**<br>• Closing: on or before **August 5, 2016** |
| **Interim Arrangements with Proposed Buyer** | Prior to closing, the Debtors and Stalking Horse Bidder shall perform and satisfy all conditions to each of their respective obligations to consummate the transactions contemplated by the Stalking Horse APA that are to be performed or satisfied by such party under the Stalking Horse APA and to cause the Closing to occur as promptly as possible. |
| **Use of Proceeds** | Pay off Lender in full of claims, with balance to be deposited with the estate to pay claims pursuant to Bankruptcy Code priorities and the orders of the Court. |
| **Tax Exemption** | None. |
| **Records Retention** | Post-Closing books and records will be maintained as set forth in Section 7.3 of the Stalking Horse APA. |
| **Sale of Avoidance Actions** | The Stalking Horse APA contemplates that all Avoidance Actions are Excluded Assets and will be retained by the estates. |
| **Requested Findings as to Successor Liability** | All of the Assets shall be sold free and clear of all liens, interests, and other encumbrances (other than the Assumed Obligations). |
| **Executory Contracts and Unexpired Leases** | The Stalking Horse APA requires the Debtors to transfer the Assets to the Stalking Horse Bidder free and clear of all liens, interests, and other encumbrances (except for the Assumed Obligations). |
| **Credit Bid** | At the Auction, the Agents, on behalf of themselves and the Lenders, shall have the right to credit bid all or a portion of the value of their claims within the meaning of section 363(k) of the Bankruptcy Code.  In the case of a credit bid, such bid must contain a cash component sufficient to pay the Breakup Fee and satisfy in full all senior liens on the collateral subject to the credit bid. |

| Relief from Bankruptcy Rule 6004(h) | To maximize the value received for the Assets, the Debtors are seeking to close the transactions contemplated by the Successful Bidder's Purchase Agreement as soon as possible after the Sale Hearing. The Debtors, therefore, have requested a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). |
|---|---|

## The Bid Procedures Order

**I.     The Bid Procedures.**

27.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order. The following describes the salient points of the Bid Procedures and discloses certain information:[6]

- **Bid Requirements.** Subject to the rights of the Agents to credit bid, any bid by an Acceptable Bidder must be submitted in writing and determined by the Debtors, in their reasonable business judgment, to have satisfied the following requirements (as further stated in the Bid Procedures):

  *Assets and Purchase Price*: Each Bid must be a bulk bid to purchase all or substantially all of the Assets, and must clearly state which liabilities of the Debtors the Acceptable Bidder is agreeing to assume. Each Bid must clearly set forth the Purchase Price to be paid, including and identifying separately any cash and non-cash components. Notwithstanding the foregoing, however, the Back-Up Liquidation Bid shall be based on the agency agreement approved by further order of the Court.

  *Deposit*: Each Bid, other than the Stalking Horse Bid and the Back-Up Liquidation Bid, must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate cash purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**"). The Agents shall not be required to post a Deposit in connection with any credit bid.

  *Minimum Bid*: The aggregate cash consideration proposed by each Bid, other than the Back-Up Liquidation Bid, must equal to, or exceed, the sum of (i) the Bid Value set forth in the Stalking Horse Bid; plus (ii) the Overbid Increment.

---

[6] This summary is qualified in its entirety by the Bid Procedures attached as **Exhibit 1** to the Bid Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

***The Same or Better Terms***: Except as otherwise provided herein, other than the Back-Up Liquidation Bid, each Bid must, in the Debtors' business judgment and in consultation with the Agents and the representatives of any duly appointed committee of unsecured creditors ("**Committee Representatives**") be on terms the same as or better than the terms of the Stalking Horse APA unless the Stalking Horse APA is terminated due to the Stalking Horse Contingencies not being waived or deemed satisfied by the Stalking Horse Contingencies Deadline. In the event that the Stalking Horse Contingencies are timely waived or deemed satisfied, each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**"), which shall include either: (i) a schedule of Assumed Contracts (pursuant to the Stalking Horse APA) to the extent applicable to the Bid, and a copy of the Stalking Horse APA clearly marked to show all changes requested by the Acceptable Bidder (including those related to the Purchase Price and Assets to be acquired by such Acceptable Bidder), as well as all other material documents integral to such Bid. In the event that the Stalking Horse Contingencies are not timely waived or deemed satisfied, the Bids need not comply with the foregoing requirements.

***Sources of Financing***: The Bid must indicate the source of cash consideration, including proposed funding commitments and confirm that such consideration is not subject to any contingencies. The Bid should include a detailed sources and uses schedule.

***Structure***: The Bid must identify the structure proposed for undertaking the Sale, including the specific Assets of the Debtors, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's proposed structure replies.

***Tax Structure***: The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if any incremental tax liabilities will be incurred by the Debtors under the Bid.

***Assumption***: The Bid must specify which, if any, of the obligations of the Debtors the Bidder proposes to assume.

- **Bid Deadline.** Each bid must be transmitted via email (in .pdf or similar format) or other means so as to be ***actually received*** by the Debtors, counsel to the Debtors, the Lenders, the Agents, each Agent's respective counsel, the Committee Representatives, the Stalking Horse Bidder, and counsel to the Stalking Horse Bidder on or before **July 27, 2016 at 12:00 p.m. (CT)** (the "**Bid Deadline**").

- **Right to Credit Bid.** At the Auction, the Agents shall have the right to credit bid all or a portion of the value of their claims within the meaning of section 363(k) of the Bankruptcy Code. Each Agent may, but shall not be required to, notify the Debtors prior to the Bid Deadline of its intent to credit bid at the Auction, and the Debtors shall take such notice into account before seeking to cancel the Auction. For the avoidance of doubt, neither Agent shall be required to post a Deposit in connection with any credit bid. Any credit bid made by a

16

Successful Bidder must include a cash component (or otherwise provide for cash) sufficient to pay the Breakup Fee and any senior liens on the collateral that is subject to the credit bid, or otherwise provide for cash sufficient to pay the Breakup Fee and cash to pay any senior liens on the collateral that is subject to the credit bid.

- **The Auction.** If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Bid and the Back-Up Liquidation Bid), the Debtors, in consultation with the Agents and the Committee Representatives, will not conduct the Auction and shall designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid and the Back-Up Liquidation Bid as the Back-Up Bid (as defined below).

- **Bidding Increments.** Any Overbid following the initial Minimum Overbid or following any subsequent Prevailing Highest Bid shall be in increments of $100,000.00.

- **Back-Up Bidder.** Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a back-up bidder (the "**Back-Up Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Back-Up Bidder if so designated by the Debtors (the "**Back-Up Bid**"); *provided*, that in no event will an Agent which submits a credit bid be required to serve as the Back-Up Bidder; *provided, further*, that in the event that a Back-Up Bid is designate by the Debtors other than the Back-Up Liquidation Bid, the Debtors, in consultation with the Agents and the Committee Representatives, shall be entitled to designate the Back-Up Liquidation Bid as an additional Back-Up Bid.

- **Highest or Otherwise Best Bid.** When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors, in consultation with the Agents and the Committee Representatives, may consider the following factors in addition to any other factors that the Debtors, the Agents, and the Committee Representatives deem appropriate: (i) the number, type, and nature of any changes to the Stalking Horse APA requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (iv) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid Documents; (v) the timing of Bidder's proposed closing; and (vi) the tax consequences of such Qualified Bid.

- **Reservation of Rights.** The Debtors reserve their rights to modify the Bid Procedures (after consultation with the Agents and the Committee Representatives) in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including cancelling the Auction or the Sale.

28.    Importantly, the Bid Procedures recognize the Debtors' fiduciary obligations to

maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid

proposals (after consultation with the Agents and the Committee Representatives), and, as noted, preserve the Debtors' right to modify the Bid Procedures (after consultation with the Agents and the Committee Representatives) as necessary or appropriate to maximize value for the Debtors' estates.

## II.     Form and Manner of Sale Notice.

29.     On or within three (3) calendar days after entry of the Bid Procedures Order, the Debtors will cause the Sale Notice to be served on the following parties or their respective counsel, if known: (a) the United States Trustee for the Eastern District of Missouri (the "**U.S. Trustee**"); (b) counsel to any statutorily appointed committee; (c) counsel to the Stalking Horse Bidder; (d) counterparties to the Contracts (the "**Contract Counterparties**"); (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) all the Debtors' other creditors; (j) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (k) counsel to the Agents; and (l) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

30.     The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bid Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific identification of the Assets; (e) instructions for promptly obtaining a copy of the Stalking Horse APA; (f) a description of the Sale as being

53433059.9

free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of the Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse APA (or to another Successful Bidder arising from the Auction, if any).[7]

31.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors propose that no other or further notice of the Sale shall be required. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**III.     Summary of the Assumption Procedures.**

32.     The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "**Assumption Procedures**"). Because the Bid Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein. Generally, however, the Assumption Procedures: (a) outline the process by which the Debtors will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto; and (b) establish

---

[7] Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse APA (or to another Successful Bidder arising from the Auction, if any), the proposed cure amounts relating thereto, and the right, procedures, and deadlines for objecting thereto, will be provided in separate notices, attached to the Bid Procedures Order as **Exhibit 3** (the "**Contract Notice**") and **Exhibit 4** (the "**Assumption Notice**") to be sent to the applicable Contract Counterparties.

53433059.9

objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary. The Successful Bidder would retain the absolute right to decide which contracts and leases it would want to assume, with the remaining others likely to be rejected by the Debtors pursuant to separate motion.

## IV.    The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.

33.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. See In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'"); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Integrated Res., Inc., 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"). See also In re Farmland Indus., Inc., 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003); In re Channel One Comm., Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); In re Trilogy Dev. Co., LLC, 2010 Bankr. LEXIS 5636, at *3-4 (Bankr. W.D. Mo. 2010).

34.    Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action appears to enhance the debtor's estate." Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC), 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting Four B. Corp. v. Food Barn Stores, Inc., 107 F.3d 558, 567 n. 16 (8th Cir. 1997) (emphasis original, internal alterations and quotations omitted)); see In re AbitibiBowater, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy"). Under the business judgment rule, "management of a corporation's affairs

is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code." In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (approving the rejection of employment agreements and noting that "[u]nder the business judgment standard, the question is whether the [proposed action] is in the Debtors' best economic interests, based on the Debtors' best business judgment in those circumstances.") (citing In re United Artists Theatre Co., 315 F.3d 217, 233 (3d Cir. 2003); Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303 (5th Cir. 1985); In re Defender Drug Stores, Inc., 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)).

35.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); see also Food Barn Stores, Inc., 107 F.3d at 564–65 (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Res., 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

36.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See Integrated Res., 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the

value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").  Integrated Res., 147 B.R. at 657-58 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects break-up fees and other provisions negotiated in good faith).

37.     The Debtors believe that the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bid Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close a transaction. Specifically, the Bid Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

38.     At the same time, the Bid Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. Entering into the Stalking Horse APA with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market. The

Back-Up Liquidation Bid ensures that the Debtors will have a viable means to liquidate and dispose of their Assets if the Stalking Horse Bidder fails to close the Stalking Horse APA (or other Successful Bidder fails to close its Purchase Agreement) after the Auction.

39.     The Debtors submit that the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures utilized in other cases. See In re Quicksilver Res., Inc., No. 15-10585 (Bankr. D. Del. Oct. 6, 2015); In re Source Home Entm't, LLC, No. 14-11553 (Bankr. D. Del. July 21, 2014); In re Gas-Mart, Inc., No. 15-41915 (Bankr. W.D. Mo. December 17, 2015 (Federman, J.); In re Noranda Aluminum, Inc., 16-10083 (Bankr. E.D. Mo. February 29, 2016 June 23, 2016) (Schermer, J.)

## V.     The Bid Protections Have a Sound Business Purpose and Should Be Approved and are Necessary to Preserve the Value of the Debtors' Estates.

40.     The Debtors are also seeking authority to offer customary bid protections. The Debtors have agreed to pay the Breakup Fee to the Stalking Horse Bidder as an allowed administrative expense priority claim. The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." Official Comm. of Unsecured Creditors v. Interforum Holding LLC, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase

agreement." Id. Thus, the use of bidding protections has become an established practice in chapter 11 cases.

41.     Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value." Integrated Res., 147 B.R. at 659-60. Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." 995 Fifth Ave., 96 B.R. at 28; see Integrated Res., 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); In re Hupp Int'l Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

42.     In considering whether to approve bid protections under the business judgment rule, courts have considered, among other things, the following questions: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?" Integrated Res., Inc., 147 B.R. at 657. See also In re Wintz Cos., 230 B.R. 840, 846 (B.A.P. 8th Cir. 1999), aff'd, 219 F.3d 807 (8th Cir. 2000) (noting that courts permit break-up fees "provided the fees create an incentive for increased bidding in sales

from bankruptcy assets"). As stated by Judge Barta in <u>In re President Casinos, Inc.</u>, 314 B.R. 786, 789 (E.D. Mo. 2004):

> A break-up fee that is greater than the actual cost and expenses of the prospective purchaser should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 662 (S.D.N.Y.1992), appeal dismissed in <u>Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)</u>, 3 F.3d 49 (2nd Cir.1993).

43.    As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. <u>See</u> <u>In re O'Brien Envtl. Energy, Inc.</u>, 181 F.3d 527 (3d Cir. 1999).[8] The Debtors believe that the allowance of the Bid Protections is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Bid will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

44.    Here, the Bid Protections were, and remain, a critical component of the Stalking Horse Bidder's commitment. The Stalking Horse Bidder has expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The parties negotiated the requested

---

[8] <u>See</u>, <u>e.g.</u>, <u>In re Finlay Enters., Inc.</u>, et al., Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009) (approving break-up fee); <u>In re Lehman Bros. Holdings Inc.</u>, et al., Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving break-up fee and expense reimbursement); <u>In re Steve & Barry's Manhattan LLC</u>, et al., Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee and expense reimbursement); <u>In re Fortunoff Fine Jewelry and Silverware, LLC</u>, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving break-up fee); <u>In re Bally Total Fitness of Greater New York, Inc.</u>, Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); <u>In re G+G Retail, Inc.</u>, Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); <u>In re Footstar, Inc</u>. Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004) (authorizing the debtors to enter into purchase agreements with break-up fees); <u>Integrated Res.</u>, 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); <u>In re Twinlab Corp.</u>, et al., Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); <u>In re Adelphia Business Solutions, Inc.</u>, et al., Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement).

53433059.9

Breakup Fee in good faith and at arm's length with significant give-and-take with respect to proposed Bid Protections. As a result, by agreeing to the Bid Protections, the Debtors ensured that their estates would have the benefit of the transactions with the Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

45.    Further, there is ample precedent for approving a break-up fee of roughly 1.11% or $250,000.00. See, e.g., In re Hostess Brands, Inc., Case No. 12-22052 (Bankr. S.D.N.Y. 2013) (break-up fee equal to 3.5%); In re Global Crossing Ltd., Case No. 02- 40187 (Bankr. S.D.N.Y. 2002) (break-up fee equal to 4%); In re LTV Steel Co., Inc., Case No. 00-43866 (Bankr. N.D. Ohio 2000) (break-up fee equal to 7.5%); In re Fruit of the Loom, Inc., Case No. 99-4497 (Bankr. D. Del. 1999) (break-up fee equal to 3.59%); In re Graham-Field Health Prods., Inc., Case No. 99-4457 (Bankr. D. Del. 1999) (break-up fee equal to 4.65%).

46.    Courts in the Eighth Circuit have held that the average range of reasonableness for break-up fees and expenses is one to four percent of the purchase price. In re Tama Beef Packing, Inc., 312 B.R. 192, 194 (N.D. Iowa 2004), cited approvingly but reversed on other grounds, In re Tama Beef Packing, Inc., 321 B.R. 496, 498 (8th Cir. B.A.P. 2005) ("**Tama II**"). However, courts in the Eighth Circuit also have applied section 503(b) of the Bankruptcy Code to determine whether break-up fees or expenses are allowable as administrative expenses. See In re Tama Beef Packing, Inc., 290 B.R. 90, (B.A.P. 8th Cir. 2003) ("**Tama I**"),[9] President Casinos, 314 B.R at 788-89. The Tama I court agreed with the reasoning of the Third Circuit and held that "the determination of whether break-up fees or expenses are allowable under section 503(b)(1)(A) will be made in reference to general administrative expense jurisprudence." The O'Brien court held that even though bidding incentives are measured against a business

---

[9] In Tama II, the BAP "revised," but did not overrule, the analysis in Tama I concerning break-up fees, concluding that "the break-up fee discussion was superfluous" as the buyer's claim at issue in the case was not a break-up fee, but simply an administrative expense.

judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate. See 181 F.3d at 533.

47.    The Third Circuit defined at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if the assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, if the availability of break-up fees and expenses were to "induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

48.    If the Court does not approve the Bid Protections, the Stalking Horse Bidder may elect not to serve as the stalking horse, to the detriment of the Debtors' estates. Further, if the Bid Protections were to be paid, it will likely be because the Debtors have received higher or otherwise superior offers for the Assets. In short, the proposed Bid Protections are fair and reasonable under the circumstances because it constitutes a "fair and reasonable percentage of the proposed purchase price" and is "reasonably related to the risk, effort, and expenses of the prospective purchaser." Integrated Res., 147 B.R. at 662. Accordingly, the Bid Protections should be approved. The Bid Protections are reasonable and appropriate in light of the size and nature of the transactions and considerable effort and expenses that the Stalking Horse Bidder has expended and will continue to expend. Also, the Bid Protections were a material inducement to Stalking Horse Bidder to enter into the APA. The Stalking Horse Bidder's bid serves as a

minimum bid for others to exceed, thereby ensuring that during the Auction, if any, the Debtors will receive no less than the Purchase Price for the Assets, and the others bidders should be encouraged to participate in a robust auction process. Thus, the Bid Protections should be approved under Section 503(b).

49.     The Debtors anticipate that the Back-Up Liquidation Bid may include a proposed breakup fee and will seek approval of such fee at the status hearing on or about July 26, 2016. The Debtors anticipate that any such breakup fee will be consistent with the foregoing standards.

## VI.     The Form and Manner of the Sale Notice Should Be Approved.

50.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

51.     As noted above, within three (3) calendar days of entry of the Bid Procedures Order, the Debtors will serve the Sale Notice upon the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) any statutorily appointed committee; (c) the Stalking Horse Bidder; (d) the Contract Counterparties; (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Assets; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) all the Debtors' other creditors; (j) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.

53433059.9

52.     The Debtors submit that notice of this motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**VII.     The Assumption Procedures Are Appropriate and Should Be Approved.**

53.     As set forth above, the Sale contemplates the assumption and assignment of the Contracts to the Stalking Horse Bidder or Successful Bidder arising from the Auction, if any. In connection with this process, the Debtors believe it is necessary to establish a process by which: (a) the Debtors and Contract Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Contracts and/or related cure amounts (the "**Assumption Procedures**").

54.     As set forth in the Bid Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Contract Notice. See In re Tabone, Inc., 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); In re Gabel, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

55.     The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties, and provide certainty to all parties in

interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bid Procedures Order.

56.     Even though not all Contracts are sought to be assumed by the Stalking Horse Bidder, the Debtors are, pursuant to the Assumption Procedures, preparing for a potential Successful Bidder to assume all Contracts at their decision.    The ultimate selection of the Contracts will be determined by the Successful Bidder and any listing of any Contract as assumed on any list or for purposes of determining any cure amount is not final until so under the Assumption Procedures.    The Debtors reserve any and all rights for Contracts not so assumed and assigned pursuant to the Assumption Procedures, and may reject those Contracts or leases subject to further order of this Court.

## VIII.    The Sale Should Be Approved as an Exercise of Sound Business Judgment.

57.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. See Martin, 91 F.3d at 395 ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); Schipper, 933 F.2d at 515; In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); In re Telesphere Commc's, Inc., 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

58.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." In re S.N.A. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. Ill

1995); see In re Filene's Basement, LLC, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate."); Integrated Res., 147 B.R. at 656; In re Johns-Manville Corp., 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

### a. A Sound Business Purpose Exists for the Sale.

59.      As set forth above, the Debtors have a sound business justification for selling the Assets. ***First***, the Debtors believe the Sale will maximize the Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a stand-alone basis. Moreover, because the Stalking Horse APA contemplates the assumption of certain of the Debtors' estates' Contracts, it will result in payment in full for a number of the Debtors' estates' creditors.

60.      ***Second***, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. See, e.g., In re Trans World Airlines, Inc., No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (stating, while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

61.    *Third*, as set forth above, the Debtors commenced a marketing effort prior to the Petition Date to maximize the value of the Assets. In particular, the Debtors pursued various sources of refinancing of the obligations owed to the Lenders and potential sales of the assets of, and/or equity interests in, the Debtors. The Debtors also solicited interest from liquidation firms relating to a potential Full Chain Liquidation. Finally, after the emergence of the Stalking Horse Bidder, the Debtors supplemented their marketing efforts by contacting approximately 53 private equity firms and 11 strategic competitors that might be interested in purchasing the Assets as a going concern.

62.    Thus, the Debtors submit that the Successful Bidder's Purchase Agreement (a "**Purchase Agreement**") will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into the Successful Bidder's Purchase Agreement will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

### b. Adequate and Reasonable Notice of the Sale Will Be Provided.

63.    As described above, the Sale Notice: (a) will be served in a manner that provides at least 21 days' notice of the deadline for objecting to the Sale and the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale

Notice will have been approved by this Court pursuant to the Bid Procedures Order after notice and a hearing before it is served on parties in interest.

64.    Courts in similar retail cases have approved expedited bid procedures and sale processes. For example, in In re Dots, LLC, the bankruptcy court approved bid procedures, without a stalking horse purchaser being obtained before the bid procedures hearing, and then entered a sale order 38 days after the petition date where the auction would determine the value of the debtor's assets, the sale was the "linchpin" of the debtor's restructuring, the debtor provided its secured creditor and the committee with input in the auction, and the debtor provided the required notice. See No. 14-11016 [Docket Nos. 132 & 242] (Bankr. D.N.J. Jan. 31, 2014). And, in In re Loehmann's Holdings, Inc., the bankruptcy court approved bid procedures four days after the petition date, see No. 13-14050 [Docket No. 67] (Bankr. S.D.N.Y. Dec. 19, 2013), and the liquidation sale of the debtor's assets 23 days after the petition date because, prior to the bankruptcy filing, the debtors unsuccessfully marketed a going concern sale, and then obtained bids from liquidators, and during the case, allowed the secured creditor and committee to have input in the auction, and preserved sale objections of landlords.  See id. [Docket Nos. 15 & 200]. Finally, in In re Love Culture, Inc., the bankruptcy court approved bidding procedures 9 days after the petition date and the liquidation sale 21 days after the petition date because, prior to the petition date, the debtors unsuccessfully marketed their assets as a going concern and then obtained bids from liquidators.  See No. 14-24508 [Docket Nos. 35, 88, & 124] (Bankr. D.N.J. July 31, 2014).

65.    Here, the Debtors conducted a successful marketing sale effort prior to the Petition Date which resulted in the Stalking Horse Bid. Also, the Debtors obtained the Liquidation Proposals from liquidation firms, so if the Stalking Horse APA is terminated or

ultimately fails to close, the Debtors will have a back-up plan to sell and liquidate the Assets pursuant to Back-Up Liquidation Bid. Further, the Debtors will actively consult with the Agents and Committee Representatives in connection with any competing Bids that are received and at the Auction to ensure that the value of the Assets is maximized. Therefore, based on the above authority, the Debtors' proposed expedited bid procedures and sale processes are appropriate.

66.    Finally, time is of the essence because any undue delay in a sale will substantially damage the Debtors' business. The Debtors have not had sufficient funds to purchase needed inventory and fully stock their stores. Dropping inventory levels have in turn negatively impacted the Debtors' cash flows, which make a lengthy post-petition sale process untenable given the attendant chapter 11 administrative costs. Falling inventory levels also erode the value of the Assets which the Stalking Horse Bidder seeks to purchase, which in turn may cause the Stalking Horse Bidder to be unwilling to pay the proposed Purchase Price for the Assets. Thus, the Stalking Horse Bidder has insisted upon an outside closing date of **August 5, 2016**. Finally, an early August closing date is necessary so that the Stalking Horse Bidder (or other Successful Bidder) can then immediately commence substantial new inventory purchases so that it can fully stock the stores in time for the start of the prime hockey selling season starting in late August/early September, coinciding with back-to-school.  There is up to a 30-day lag in ordering and then receiving product.

67.    For these reasons, the Debtors' proposed expedited bid procedures and sale processes are critical and necessary.

**c.  The Sale and Purchase Price Reflects a Fair Value Transaction.**

68.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine

value is exposure to the market. See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999); Trans World Airlines, 2001 WL 1820326, *4 (stating, while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

69.    Moreover, as noted above, even as the Debtors move forward with the Sale, the Debtors will continue to market the Assets and solicit other offers consistent with the Bid Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Stalking Horse APA's purchase price will, conclusively, be fair value.

### d. The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder Is a "Good-Faith Purchaser."

70.    The Debtors request that the Court find the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

71.    Section 363(m) of the Bankruptcy Code provides:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

72.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); In re Andy Frain Srvs., Inc., 798 F.2d 1113 (7th Cir. 1986) (same); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same); In re Andy Frain Services, Inc., 798 F.2d 1113 (7th Cir. 1986); See In re Trism, 328 F.3d 1003, 1006 (8th Cir. 2003).

73.     The Debtors submit that the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, including the liquidation firm under the Back-Up Liquidation Bid, is or will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse APA, or any marked versions thereof, and the Back-Up Liquidation Bid, are or would be good-faith agreements on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[10] *First*, as set forth in more detail above,

---

[10] The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction. Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures. In addition, the Debtors will not choose, after consultation with the Agents and the Committee Representatives, as the Successful Bidder or Back-Up Bidder (as defined in the Bid Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

the consideration to be received by the Debtors pursuant to the Stalking Horse APA is substantial, fair, and reasonable. ***Second***, the parties entered into the Stalking Horse APA in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. ***Third***, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or Stalking Horse APA to be avoided under section 363(n) of the Bankruptcy Code. And, with respect to potential bidders, the Bid Procedures are designed to ensure that no party is able to exert undue influence over the process. ***Finally***, the Stalking Horse Bidder's offer was evaluated and approved by the Debtors in consultation with their advisors, and any other bids that the Debtors ultimately determine to be a successful bid will have been evaluated in a similar fashion. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and Stalking Horse APA (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code. The Debtors respectfully submit that the foregoing factors are also true with respect to the Back-Up Liquidation Bid.

### e.    The Sale Should be Approved "Free and Clear" Under Section 363(f).

74.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject

of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable

proceeding to accept a monetary satisfaction of its interest. See 11 U.S.C. § 363(f).

75.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the

requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free

and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances),

except with respect to any interests that may be assumed liabilities under the applicable

Purchase Agreement. See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002)

("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free

and clear of all liens.").

76.    The Debtors submit that any interest that will not be an assumed liability satisfies

or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and

that any such interest will be adequately protected by either being paid in full at the time of

closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses

the Debtors may possess with respect thereto. The Debtors accordingly request authority to

convey the Assets to the Stalking Horse Bidder or other Successful Bidder arising from the

Auction, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances,

with any such liens, claims, rights, interests, charges, and encumbrances to attach to the

proceeds of the Sale.

**f.    Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.**

77.    A secured creditor is allowed to "credit bid" the amount of its claim in a sale.

Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause

orders otherwise, the holder of a claim secured by property that is the subject of the sale "may

bid at such sale, and, if the holder of such claim purchases such property, such holder may

offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. See In re Submicron Sys. Corp., 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

78.    Absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. See Source Home Entm't, LLC, No. 14-11553 (Bankr. D. Del. July 21, 2014) (order approving bid procedures which authorized parties with secured claims to credit bid); In re PTC Alliance Corp., No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative DIP Lender to credit bid).

79.    Thus, the Agents should be entitled to credit bid at the Auction as set forth in the Bid Procedures.

**IX.    The Assumption and Assignment of the Contracts Should Be Approved.**

    **a.    The Assumption and Assignment of the Contracts Reflects the Debtors' Reasonable Business Judgment.**

80.    To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign or transfer the Contracts to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, to the extent required by such bidders.

81.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign his executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future

performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. See Grp. of Institutional Invs. v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); In re Network Access Solutions, Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

82.    Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment: *First*, the Assumed Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. *Second*, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. *Third*, the Stalking Horse APA provides that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, the Sale. *Finally*, the Assumed Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

83. Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

### b. Defaults Under the Assumed Contracts Will Be Cured Through the Sale.

84. Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." In re Luce Indus., Inc., 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

85. The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse APA requires that all defaults associated with, or that are required to properly assume, the Assumed Contracts be cured and paid from the Purchase Price pursuant to the escrow to be established under the Stalking Horse APA. See Stalking Horse APA § 6.8. Because the Bid Procedures Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

**c.  Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

86.    Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." In re U.L. Radio Corp., 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605‑06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

87.    The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) will be satisfied. As required by the Bid Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assumed Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assumed Contracts assigned to the Stalking Horse Bidder or any Successful Bidder arising from the Auction. Further, the Assumption Procedures provide the Court and other interested parties ample opportunity to

evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or any Successful

Bidder arising from the Auction to provide adequate assurance of future performance and object

to the assumption of the Assumed Contracts or proposed cure amounts. The Court therefore

should have a sufficient basis to authorize the Debtors to reject or assume and assign the

Assumed Contracts as set forth in the Stalking Horse APA.

### X.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

88.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property . . . is stayed until the expiration of fourteen days after the entry of the order,

unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an

"order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed

until the expiration of fourteen days after the entry of the order, unless the court orders

otherwise." The Debtors request that the Sale Order be effective immediately upon its entry by

providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

89.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient

time for an objecting party to appeal before an order can be implemented. See Advisory Comm.

Notes to Fed. R. Bankr. P. 6004(h) & 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d)

and the Advisory Committee Notes are silent as to when a court should "order otherwise" and

eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that

the fourteen-day stay should be eliminated to allow a sale or other transaction to close

immediately "where there has been no objection to procedure." 10 COLLIER ON BANKRUPTCY ¶

6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the

objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of

time actually necessary to file such appeal. Id.  The Debtors note that similar requests to waive

the stay imposed under Bankruptcy Rules 6004(h) are routinely granted. See, e.g., In re Bakers Footwear Grp. Inc., No. 12-49658 (CER) (Bankr. E.D. Mo. Nov. 1, 2012); In re ContinentalAFA Dispensing Co., No. 08-45921 (KAS) (Bankr. E.D. Mo. Nov. 12, 2008); In re the Great Atlantic & Pacific Tea Co., Inc., Case No. 15-23007 (SCC) (Bankr. S.D.N.Y. Aug. 11, 2015); In re Delia's, Inc., Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015); In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Nortel Networks Inc., et al., Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009).

90.     To maximize the value received for the Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

91.     Notice of this Motion has been given to: (a) the Agents, along with their respective counsel; (b) all parties who have expressed a written interest in some or all of the Assets; (c) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (d) the Office of the United States Trustee for the Eastern District of Missouri; (e) the Debtors' 20 largest unsecured creditors; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; and (h) the United States Attorney's Office for the Eastern District of Missouri.   In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

92.     All parties who have requested electronic notice of filings in these cases through the Court's ECF system will automatically receive notice of this motion through the ECF system no later than the day after its filing with the Court. A copy of this Motion and the Stalking Horse Agreement will also be made available on the Case Website. The proposed Stalking Horse

53433059.9

Approval Order may be modified or withdrawn at any time without further notice. If any significant modifications are made to the Stalking Horse Approval Order, the amended proposed Stalking Horse Approval Order will be made available on the Debtors' Case Website, and no further notice will be provided. In light of the relief requested, the Debtors submit that no further notice is necessary. In light of the relief requested, the Debtors submit that no further notice is necessary.

## **No Prior Request**

93.      No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these chapter 11 cases.

[Remainder of the page intentionally left blank]

45

53433059.9

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an order, substantially in the form submitted to the Court, granting the relief requested herein; and (ii) grant such other relief as is necessary.

Dated: July 6, 2016
St. Louis, Missouri

**Polsinelli PC**

*/s/ Matthew S. Layfield*
Matthew S. Layfield, MO 57540
100 S. Fourth St.
Suite 1000
St. Louis, MO 63102
Telephone: (314) 889-8000
Facsimile: (314) 231-17776
mlayfield@polsinelli.com

and

James E. Bird (pro hac pending)
Andrew J. Nazar (pro hac pending)
900 W. 48th St.
Suite 900
Kansas, MO 64112
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
jbird@polsinelli.com
anazar@polsinelli.com

and

Jerry L. Switzer, Jr. (pro hac pending)
161 N. Clark St.
Suite 4200
Chicago, IL 60601
Telephone: (312) 819-1900
Facsimile: (312) 819-1910
jswitzer@polsinelli.com

*Proposed Counsel for the Debtors and Debtors in Possession*

53433059.9